SEALED

PAR/AET: 2022R00474
JTM 08.08.22

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. RDB 22cr290 |
| | * | |
| LAWRENCE A. WALKER, | * | (Wire Fraud Conspiracy, 18 U.S.C. |
| | * | § 1349; Forfeiture, 18 U.S.C. |
| Defendant. | * | § 981(a)(1)(C), 21 U.S.C. § 853(p), |
| | * | 28 U.S.C. § 2461(c)) |
| | * | |
| | * | |

**INDICTMENT**

**COUNT ONE**
**(Wire Fraud Conspiracy)**

**Relevant Individuals, Entities, and Account**

The Grand Jury for the District of Maryland charges that:

At all times material to the Information:

1. Defendant LAWRENCE A. WALKER (**"WALKER"**) was a resident of Baltimore City, Maryland.

2. On or about April 6, 2012, **WALKER** incorporated a business with state of Maryland called Nustcola Street Promotions, LLC ("Nutscola"). **WALKER** was the owner and resident agent of Nutscola.

3. Nutscola maintained an account at J.P. Morgan Chase ("Chase"), a financial institution insured by the Federal Deposit Insurance Corporation and doing business throughout the United States, with an account number ending in 00052 (the "00052 Account"). **WALKER** was the sole signatory on this account.

4. Bank 1 was a federally insured financial institution headquartered in Fort Lee, New Jersey. Bank 1 was an approved United States Small Business Administration ("SBA") lender and participated as a lender in the Paycheck Protection Program ("PPP").

5. Co-conspirator A.S. was a resident of Baltimore, Maryland who ran a purported financial services business.

6. Payroll Processor 1 is a payroll processing and technology company headquartered in Oklahoma City, Oklahoma doing business throughout the United States.

**The Paycheck Protection Program**

7. The SBA is an executive-branch agency of the United States government that provides support to entrepreneurs and small businesses. The mission of the SBA is to maintain and strengthen the nation's economy by supporting the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.

8. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in and around March 2020, designed to provide emergency financial assistance to Americans suffering from the economic effects caused by the COVID-19 pandemic. Two sources of relief provided by the CARES Act were the authorization of forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program and the expansion of the Disaster Loan Program to include pandemic related economic injury through COVID-19 Economic Injury Disaster Loans ("EIDL").

9. To obtain a PPP loan, a qualifying business had to submit a PPP loan application signed by an authorized representative of the business. The PPP loan application required the business, through its authorized representative, to acknowledge the program rules and to make affirmative certifications to be eligible for the PPP loan. For example, in the PPP loan application (SBA Form 2483), the business, through its authorized representative, had to state its average monthly payroll expenses and number of employees. In addition, as part of the PPP loan application process, businesses had to provide documentation showing their payroll expenses.

These figures were used to calculate the amount of money the small business was eligible to receive under the PPP.

10. Once a qualifying business completed a PPP application, a participating lender, or agent on behalf of the participating lender, processed the application. If a PPP loan application was approved, the participating lender funded the PPP loan using its own monies, which the SBA guaranteed. In the course of processing the PPP loan, the lender transmitted data from the loan application to the SBA, including information about the borrower, the total amount of the loan, and the identified number of employees.

11. Proceeds from a PPP loan were legally required to be used only for certain permissible business expenses, including payroll costs, mortgage interest, rent, and utilities. Under the applicable PPP rules and guidance, the interest and principal on the PPP loan was eligible for forgiveness, if the business spent the loan proceeds on permissible items within a designated period of time and used a certain portion of the loan toward payroll expenses.

### PPP Loan Application

12. On or about March 24, 2021, A.S. submitted, or assisted with the submission of, a PPP loan application to Bank 1 for Nutscola with the knowledge and consent of **WALKER**.

13. Prior to submission of that application, **WALKER** provided A.S. certain documents to be included with the PPP loan application, including photographs of **WALKER**'s Maryland driver's license, and a voided check from the 00052 Account.

14. A purported February 2020 bank statement for the 00052 Account was also included with the application.

15. The PPP loan application for Nutscola reported that Nutscola had 13 employees and an average monthly payroll of $104,900.87.

16. On or about March 24, 2021, the PPP loan application was manually or electronically signed with **WALKER**'s name as the owner of Nutscola.

17. In addition, the PPP loan application contained the initials of **WALKER** to certify each of the following representations:

   a. Nutscola was in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099-MISC;

   b. The funds will be used to retain workers and maintain payroll or make mortgage payments, lease payments, and utility payments; and

   c. The information provided in the application and the information provided in all supporting documents and forms is true and accurate in all material respects.

18. The PPP loan application for Nutscola included a falsified Internal Revenue Service (IRS) Form 940—Employer's Annual Federal Unemployment Tax Return—for 2019, to substantiate the amount of wages paid to purported employees of Nutscola for the 2019 tax year. The falsified 2019 Form 940 indicated "Total payments to all employees" of $1,258,810.53.

19. In fact, during the 2019 tax year, Nutscola paid no wages to any employee.

20. Moreover, the IRS has no records of any filed tax records for any part of 2019 or 2020 for Nutscola.

21. The PPP loan application for Nutscola also included a falsified February 2020 bank statement for the 00052 Account to substantiate, among other things, that Nutscola was in operation on February 15, 2020.

22. In fact, the 00052 Account was not opened by **WALKER** until March 6, 2021.

**PPP Loan Funding And Kickback Payments To A.S.**

23. Based on the fraudulent and false representations and submissions in the PPP loan application, made on behalf of **WALKER** as the owner of Nutscola, the PPP loan was funded, and on or about March 26, 2021 approximately $262,252.00 was distributed by Bank 1 to the 00052 Account.

24. For his work on the PPP loan application for Nutscola, A.S. expected to receive a kickback payment of approximately 30 percent of the funded loan amount ($78,000.00) from **WALKER**.

25. Less than one week after the PPP loan funded, **WALKER** provided A.S. the following checks signed by **WALKER**, which were drawn on the 00052 Account and reflected payment to A.S. for his work on the PPP loan application for Nutscola:

   a. Check # 2351, dated March 31, 2021, in the amount of $40,000.00; and

   b. Check # 2352, dated March 30, 2021, in the amount of $38,000.00.

26. At the time **WALKER** provided A.S. the checks referenced in paragraph 25, **WALKER** left the payee name on each check blank.

27. Thereafter, A.S. and others known and unknown to the Grand Jury, wrote a payee name on each of the checks, each check was ultimately deposited, and each was ultimately drawn on the 00052 Account.

### Establishment of Payroll For Purported Employees Of Nutscola

28. On or about March 30, 2021, **WALKER** signed an agreement with Payroll Processor 1 pursuant to which Payroll Processor 1 agreed to provide payroll processing services for Nutscola and its purported employees. The agreement authorized Payroll Processor 1 to make withdrawals from the 00052 Account for the purpose of making payments to purported employees of Nutscola. Each of these individuals had been identified by **WALKER** as employees of Nutscola but, in fact, were not employed by the business.

29. Beginning on or about April 9, 2021 and continuing through on or about December 9, 2021, Payroll Processor 1 made purported payroll payments from the 00052 Account via ACH debits to **WALKER**'s brother, and other associates that purported to be employees of Nutscola.

30. Beginning in or around March 2021 and continuing through in or around December 2021, in the District of Maryland and elsewhere, the defendant,

**LARRY WALKER**,

knowingly and willfully, conspired and agreed with A.S. and others known and unknown to the Grand Jury to commit any offense under Chapter 63 of Title 18, United States Code, namely, to knowingly and willfully execute and attempt to execute a scheme and artifice to defraud a financial institution, namely Bank 1, and to obtain and attempt to obtain money and property of Bank 1 by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing and attempting to execute the scheme to defraud, did knowingly and willfully transmit and cause to be transmitted by means of wire communications, in interstate and foreign commerce, writings, signs, signals, pictures, and sounds (the "scheme to defraud"), in violation of 18 U.S.C. § 1343.

**The Object of the Scheme to Defraud**

31. It was the object of the conspiracy and scheme to defraud for **WALKER** to personally enrich himself by: (1) fraudulently obtaining a PPP loan in the amount of more than $262,000.00 for his own personal use and benefit, and for the personal benefit and use of his associates; and (2) offering and paying kickbacks in return for the submission of the false and fraudulent PPP loan application.

**Manner and Means of the Scheme to Defraud**

32. It was part of the conspiracy and scheme to defraud that **WALKER**, A.S., and others known and unknown to the Grand Jury, conspired to submit false materials, including a

false PPP loan application, a false 2019 IRS Form 940, and a false February 2020 bank statement for the 00052 Account to Bank 1 to obtain a PPP loan for Nutscola.

33. It was a further part of the conspiracy and scheme to defraud that A.S. and others known and unknown to the Grand Jury, fabricated a false IRS Form 940 to be submitted with the PPP loan application for Nutscola. The purpose of the false IRS Form 940 was to circumvent Bank 1's requirement that prospective borrowers submit documentation to support the payroll figures that served as the basis for the PPP loan amount. The false IRS Form 940, which had never been filed with the IRS, was submitted in support of the PPP loan application for Nutscola.

34. It was a further part of the conspiracy and scheme to defraud that the fabricated IRS Form 940 reflected that Nutscola paid $1,258,810.53 in wages to all employees in 2019. In fact, in 2019 and 2020, Nutscola: (1) did not file any 2019 Form 940 with the IRS; (2) pay unemployment tax to the IRS; or (3) withhold federal income tax for any employee.

35. It was a further part of the conspiracy and scheme to defraud that A.S. and others known and unknown to the Grand Jury, fabricated a false February 2020 bank statement for the 00052 Account. The purpose of the fabricated February 2020 bank statement for the 00052 Account was to circumvent Bank 1's requirement that prospective borrowers submit documentation to support that the borrower's business was in operation on February 15, 2020. The fabricated February 2020 bank statement for the 00052 Account was submitted in support of the PPP loan application for Nutscola.

36. It was a further part of the conspiracy and scheme to defraud that the fabricated February 2020 bank statement for the 00052 Account indicated that the account was opened in February 2020 and had a balance of $58,637.47. In fact, the 00052 Account was not opened until March 6, 2021.

37. It was a further part of the conspiracy and scheme to defraud that based on the fraudulent and false representations and submissions made on behalf of **WALKER** as the owner of Nutscola, on or about March 25, 2021, the PPP loan was funded, and approximately $262,252.00 was distributed by Bank 1 to the 00052 Account belonging to Nutcola.

38. It was a further part of the conspiracy and scheme to defraud that **WALKER** paid A.S. a total of $78,000.00 in kickbacks, reflecting approximately 30 percent of the PPP loan amount received by Nutscola in exchange for A.S.'s role in submitting the PPP loan application for the purported business.

39. It was a further part of the conspiracy and scheme to defraud that **WALKER** paid A.S. this kickback by providing him a total of two checks (referenced in paragraph 25 above), each of which was signed by **WALKER** and had a dollar amount filled in, but that left the payee blank.

40. It was a further part of the conspiracy and scheme to defraud that A.S. and others unknown and unknown to the Grand Jury that A.S. wrote a payee name on each of the checks, each check was deposited into accounts controlled by A.S. and his associates, and each check was ultimately drawn on the 00052 Account.

41. It was a further part of the conspiracy and scheme to defraud that after receiving the PPP loan for Nutscola, **WALKER**, with the assistance of A.S., established payroll processing services through Payroll Processor 1 for the purpose of making payments to purported employees of Nutscola. The purpose of establishing payroll services for Nutscola after receipt of the PPP loan was to facilitate the creation of documentation that could be used to substantiate a request for the PPP loan to be forgiven.

42. It was further part of the conspiracy and scheme to defraud that **WALKER** made no payments to Bank 1 in connection with PPP loan for Nutscola.

43. It was a further part of the conspiracy and scheme to defraud that **WALKER** caused PPP loan proceeds from the 00052 Account to be transferred and used for personal and unauthorized expenses, including the purchase of a Mercedes-Benz S550V4 automobile and the lease of a luxury apartment in Baltimore, Maryland.

44. It was a further part of the conspiracy and scheme to defraud that **WALKER**, A.S., and others known and unknown to the Grand Jury, utilized interstate wires to submit, assist in the submission, and communicate with each other about the submission of a PPP loan application to Bank 1 and to establish payroll processing services from Payroll Processor 1 for Nutscola.

18 U.S.C. § 1349

## FORFEITURE ALLEGATION

The United States Attorney for the District of Maryland further finds that:

1. Pursuant to Federal Rule of Criminal Procedure 32.2, notice is hereby given to the defendant that the United States will seek forfeiture as part of any sentence in accordance with 18 U.S.C. § 981(a)(1)(C), 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c), as a result of the defendant's conviction under the offense in Count One of this Indictment.

### Wire Fraud Forfeiture

2. Upon conviction under the offense in Count One of this Indictment, the defendant,

**LARRY WALKER**

shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes,or is derived from proceeds traceable to the scheme to defraud.

### Substitute Assets

5. If any of the property described above, as a result of any act or omission of the defendant:

   a. cannot be located upon the exercise of due diligence;
   b. has been transferred or sold to, or deposited with, a third party;
   c. has been placed beyond the jurisdiction of the court;
   d. has been substantially diminished in value; or
   e. has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c).

18 U.S.C. § 981(a)(1)(C)
21 U.S.C. § 853(p)
28 U.S.C. § 2461(c)

*Erek L. Barron / AET*
Erek L. Barron
United States Attorney

A TRUE BILL

**SIGNATURE REDACTED**

Foreperson

Date: August 16, 2022